Filed 1/17/23  Marriage of Cherinka CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| In re the Marriage of PATRICIA M. and JOHN D. CHERINKA. | C094647 |
| PATRICIA M. CHERINKA,<br><br>Appellant,<br><br>v.<br><br>JOHN D. CHERINKA,<br><br>Respondent. | (Super. Ct. No. S-DR-0045142) |

When Patricia M. and John D. Cherinka separated after over 42 years of marriage, they agreed John would pay Patricia one-half of his total income in spousal support, or no less than $2,500 per month.[1]  John retired four years after the parties separated, and he asked the trial court to modify spousal support due to a change in circumstances—

---

[1] As is customary in marital dissolution cases, we refer to the parties by their first names.

1

namely, his reduced income in retirement. The trial court granted the request, and modified spousal support to $1,600 a month, retroactive to the date the request was filed. It also granted Patricia's request for spousal support arrears, but awarded her only $31,388, which was much less than she sought. Finally, it awarded her $6,000 in attorney's fees, which, again, was much less than she sought. Patricia challenges all three orders. We affirm the trial court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties' Separation and Marital Settlement Agreement

Patricia and John separated in 2014 after over 42 years of marriage. Patricia filed a petition for legal separation on April 1, 2014, which John did not contest. Patricia was 60 at the time, was not employed, and had not worked outside the home for most of the marriage. John was 65 and worked for the El Dorado County Sheriff's Department as a detention aide. John was also receiving (1) Department of Veterans Affairs (VA) disability benefits and (2) a federal pension (he had previously worked for the federal government for approximately 32 years).

In January 2015, Patricia and John executed a marital settlement agreement (MSA) that determined spousal support and the division of their assets. The MSA provided for spousal support as follows: "[Husband] shall pay to [Wife] for spousal support 1/2 his total income which include[s]: Federal Retirement, VA Disability and El Dorado County Income or a sum no less than $2,500.00 per month . . . , commencing on March 31, 2014 and continuing . . . [¶] . . . [u]ntil either party's death, the remarriage of the party receiving spousal support, or modification or termination by further court order, whichever comes first. [¶] In addition, [Husband] to equally split the Social Security Benefit when received and shall file for this benefit prior to [Wife's] 62nd birthday, May 2015." Exhibits attached to the MSA reiterate, "Spousal support to [Wife] [is] no less than the amount of $2,500.00 per month. Amount to be equal to 1/2 of Husband's income/retirement/VA benefits."

2

The MSA also provided John would maintain coverage for Patricia under the health insurance provided through his employment, and stated, "At present husband carries two P.P.O. insurances through his retirement and current employer."

The MSA also addressed the allocation of John's retirement benefits: "Based on Husband's employment during marriage, a community interest has arisen which include the following: Benefits from Federal Retirement, VA benefits, CalPERS. [¶] The parties agree and shall cooperate in the preparation of the Qualified Domestic Relations Order or retirement benefits order for each plan, which proposed order(s) shall set forth the respective community interest of the parties and govern the disposition of benefits upon qualification by the plan(s)." A qualified domestic relations order, or QDRO, is an order directing a retirement plan to pay a portion of an employee participant's retirement benefits directly to the employee's former spouse. (See *In re Marriage of Oddino* (1997) 16 Cal.4th 67, 71.)

Finally, the MSA divided the parties' assets and obligations. Among other things, the parties agreed that each would retain one of their two cars; insurance premiums on Patricia's car would be paid by John and the amount deducted from spousal support. The parties also split the balance on their Visa credit card (approximately $15,651), and agreed that Patricia's "portion ($100) for the Visa payment . . . shall come from the Spousal Support amount."

The court entered a judgment of legal separation on February 18, 2015, ordering spousal support and the division of assets as set forth in the MSA, which was incorporated into the judgment.

*B. The California Public Employees' Retirement System QDRO*

In February 2018, John began thinking about retiring from his job with the sheriff's department, and the California Public Employees' Retirement System (CalPERS) was joined as a party to the proceedings. On June 15, 2018, the court entered a "Stipulated Domestic Relations Order Re: Division of California Public Employees'

3

Retirement System Benefits" (hereafter the QDRO). The QDRO awarded Patricia an interest in John's CalPERS retirement benefits pursuant to a mathematical formula.

   *C. John's Request to Modify Spousal Support and Patricia's Request for Spousal Support Arrears*

On July 25, 2018, John filed a request for order (RFO) modifying spousal support based on changed circumstances. In support of the RFO, John stated he was 69 years old, had significant health issues, and was currently on medical leave from his job with the sheriff's department pending retirement. He stated his income would go down when he retired, and he would no longer be able to pay Patricia $2,500 per month, as provided by the MSA. He stated he lived with his son, Brandon, and Brandon's wife, in a house that he and Brandon co-owned, and his income and expense declaration (I&E) showed his monthly expenses were around $3,200, which included a $925 mortgage payment.

Patricia opposed the RFO, and contended John should be required to continue paying spousal support as provided in their MSA. She stated she had tried to find employment since the separation, and had "submitted applications to numerous locations, some more than two or three plus times. Places such as Kohl's, Sam's Club, Black Bear Diner, Best Buy, RC Willey, Home Depot, Ashley Furnishings, Trader Joe's and others. I have never been called for an interview. There is not a market for a 65 year old woman with little to no working skills." She stated she had sold the house she and John had lived in and purchased a new house. According to her I&E, her monthly expenses were around $4,700, and included a $2,283 mortgage payment.

On October 30, 2018, Patricia filed her own RFO for an "[a]ccounting of and arrears of spousal support," and for attorney's fees. In support of the RFO, she stated John had recently begun paying her less than $2,500 per month, and "should be required to provide an accounting . . . and pay arrearages of spousal support per the judgment."

4

*D. Patricia Begins Receiving CalPERS and Social Security Benefits*

John retired effective September 15, 2018, and his monthly retirement benefit from CalPERS was $1,711. Pursuant to the formula in the QDRO, Patricia was entitled to $646, which left John with $1,065. CalPERS began making these payments directly to both parties upon John's retirement.

Also around this time, Patricia began receiving what the parties describe as "derivative" Social Security benefits of $158 a month. Under the Social Security Act, the divorced spouse of an individual who is entitled to receive Social Security benefits may be entitled to receive a divorced spouse's benefit equal to one-half the eligible spouse's benefit, and we presume the $158 Patricia receives from Social Security is her divorced spouse's benefit. (42 U.S.C. § 402(b).)

*E. The Parties' Statement of Issues*

John and Patricia agreed both RFO's would be tried together, and a trial was scheduled for January 30, 2019. Prior to trial, both parties filed a statement of issues.

In her statement of issues, Patricia contended John had marketable skills and could still work, while she had limited earning capacity because she had never worked outside the home and was thus totally reliant on what she received in spousal support. She contended John should be required to pay her a minimum of $2,500 a month.

In his statement of issues, John acknowledged that Patricia did not work outside the home during their marriage. He noted that he and Patricia were both currently retired, and that, as a result, neither party had any realistic earning capacity beyond his retirement income. He stated his current monthly retirement income was $4,391,[2] and he argued it was unreasonable to expect him to pay Patricia $2,500, or 57 percent of this amount. He

---

[2] This number appears incorrect because, by the time of trial, the parties had stipulated to John's income, and that stipulation shows his gross monthly income in retirement was never less than $5,600 a month.

5

asked the court to reduce spousal support to $1,285 per month,[3] or, in the alternative, to "no more than 50% of his monthly income, redacting the $2,500 (or greater) requirement."

*F. The Trial*

For reasons that need not concern us, the trial was continued numerous times, and was not held until March 2021.

On February 26, 2021, the court entered what we will refer to as a pretrial order, which confirmed the trial would be limited to the three issues raised by the two RFOs: (1) modification of spousal support; (2) spousal support arrears; and (3) attorney's fees. The court also adopted and signed a stipulation by the parties that identified the following amounts for each year from January 1, 2015, to August 31, 2020:

(1) John's gross income, broken down to show amounts received from:

(a) wages; (b) pensions; (c) VA disability; and (d) Social Security.

(2) The amount deducted from John's federal pension (paid by CSRS, or the Civil Service Retirement System) to pay for health insurance that covered both John and Patricia.

(3) The amount of spousal support John paid Patricia.

(4) The gross amount Patricia received from CalPERS, and the amount CalPERS deducted for survivorship benefits.

(5) The amount Patricia received from Social Security.

---

[3] This amount was calculated using the CalSupport program, which appears to be a computer program of a type that is "regularly utilized to determine *temporary* spousal support in most family law courts." (*In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 5-6, fn. 3, italics added.) Using such a program to fix *permanent* spousal support, however, is "inappropriate," although it might be appropriate to use such a program "to obtain a rapid calculation of the tax effects of each amount to each party and determine the resulting net spendable income each party would have at different levels of permanent spousal support." (*Ibid.*)

The stipulation provided the court would determine the amount of spousal support arrears and ongoing spousal support based on the amounts contained in the stipulation, with the caveat that the parties disagreed about how the deduction for health insurance and the CalPERS survivorship benefits were to be treated. The court excluded from trial all other evidence regarding the amounts agreed to in the stipulation.

To get some perspective on how much money we are talking about, in 2020, John received the following gross monthly income:

| | |
|---|---|
| CSRS | $3,352 |
| CalPERS | $1,064 |
| VA Disability | $979 |
| Social Security | $363 |
| TOTAL | $5,758.00 |

John paid Patricia $1,850 a month in spousal support, which effectively left him with $3,908 a month (before taxes). In addition, he paid $665 a month for health insurance, which was automatically deducted from his CSRS payment. Patricia received the following gross monthly income:

| | |
|---|---|
| CalPERS | $655 |
| Social Security | $158 |
| Spousal Support | 1,850 |
| TOTAL | $2,663.00 |

Patricia also paid $140 a month for her CalPERS survivorship benefit, which was automatically deducted from her CalPERS payment.

In the pretrial order, the court tentatively ruled that John's CalPERS benefits constituted income to him within the meaning of the MSA, and must be included when calculating the amount of spousal support he owed.

Trial was held on March 16 and 17, 2021. Much of the court's ruling was given from the bench. Following the trial, on June 24, 2021, the court also issued a short "Ruling on Submitted Matter," which we will refer to as the final ruling, and which addressed a few outstanding issues. The court also issued a judgment on September 23, 2021.

Both during the trial, and in the final ruling, the court affirmed its tentative ruling regarding the CalPERS benefit, commenting, "I think the MSA is pretty clear. It says half of [his] gross income." This ruling meant that, pursuant to the MSA, Patricia was entitled to one-half of John's CalPERS benefit, and all of her CalPERS benefit.[4] The court made a similar ruling regarding Social Security benefits—namely, that the amount John received from Social Security was considered his income, and, pursuant to the MSA, Patricia was entitled to one-half of that amount.

Both parties offered limited testimony at trial about their current living situation. As noted above, John lived with his son Brandon and Brandon's wife in a house that he and Brandon had purchased together after the parties' separation. In late 2019, Patricia threatened to put a lien on the house as security for her spousal support arrears and attorney's fees, and John responded by quitclaiming his interest in the house to Brandon. According to John's pretrial statement of issues, he gave Brandon his interest in the house as an early inheritance, and, in exchange, Brandon agreed John could live in the house until he died. At the time of trial, Brandon thus owned the house, and John

---

[4] It appears neither party interpreted the MSA the same way the court did. Patricia's position appears to be that her share of John's CalPERS benefit should be calculated by adding what she received from CalPERS and what John received from CalPERS, and then dividing that amount in half, and having John make up the difference, with the net effect being that they both end up with one-half of the total benefit, or $860. John's position is that his CalPERS benefit "should not be included in the spousal support calculation as it was already divided by QDRO and [Patricia] is receiving her share of the benefits directly."

testified he paid Brandon around $900 a month to cover a portion of household expenses and food.

In or around 2017, Patricia sold the house she and John had lived in, and she purchased a new house. By the time of trial, she had sold that house as well, and was living in a rented apartment. It is unclear how much she made on the sale, but according to her most recent I&E, she had $40,000 in the bank, which represented what was left of her equity in the house. In a statement attached to the I&E, she noted, "The equity I got from the house I've had to use along with my support of $1,850.00 per month to pay my bills and live." Also according to the I&E, she paid $1,750 a month in rent, and her total monthly expenses were around $4,300. What we might call her bare-bones monthly expenses (i.e., rent, food, and utilities) were around $2,500.

### i. Modification of Spousal Support

The court found John's retirement and his subsequent drop in income constituted a change of circumstances that justified modifying spousal support.

The court then made the following findings pursuant to Family Code section 4320.[5] The parties had a very long-term marriage. During the marriage they had a middle class lifestyle, "maybe even slightly below the midrange of middle class," but there was not enough money postseparation to allow both parties to maintain that lifestyle, or, as the court put it, "everyone agrees -- these are not people of great means, and there is not a whole lot of money in the pot, and I [have] to decide how it gets divvied up." Realistically, neither party was able to work. John was retired and had medical problems. Patricia had effectively never worked outside the home and it would be difficult for her to find a job now at the age of nearly 68. As a result, the court found

---

[5] Further undesignated statutory references are to the Family Code.

it was not reasonable to believe Patricia could become self-supporting. Neither party had significant assets.

The court also found the tax consequences of modifying spousal support would hit John harder than Patricia, stating a "[b]ig change in this case is the shift in tax liability. That alone requires a substantial change because the tax liability is shifting from [Patricia] to [John]. [¶] . . . [¶] The shift is that [spousal support payments] used to be deductible [to John] and taxable to [Patricia]. Now it's tax free to her, and it's not a deduction for him." We presume the court was referring to a change in federal tax law brought about by the Tax Cuts & Jobs Act of 2017. (Hogoboom & King, Cal. Prac. Guide: Family Law (The Rutter Group 2022) ¶ 6.925.) Prior to the change, spousal support payments were deductible by the payor spouse (John), and included as income by the receiving spouse (Patricia). (*Id*., ¶¶ 6.925, 10.15.) Effective January 1, 2019, however, spousal support payments are no longer deductible by the payor, or included as income of the recipient. (*Ibid*.)

Finally, the court found that, although the separation had caused financial hardships to both parties, "The hardships are a little bit more on [Patricia's] side. Reason being, if there were to be further financial decline, [John], I don't think Brandon is going to throw him out if he couldn't fund the whole $940, or whatever that number is. I think that he would still have a viable living situation at Brandon's place, particularly since he, essentially, made a gift of $20,000 to him, if not more. [¶] [Patricia], on the other hand, I think if she can't meet her obligations, I think she's out on the street. I think that's true."

After making these findings, the court then announced its ruling as follows: "Taking all of this into account and the final financial condition of the parties, spousal support . . . will be . . . $1,600" a month.

Using the amounts in the parties' stipulation, the court's order means that, going forward, Patricia will receive $1,600 per month in spousal support from John, and will keep all of her CalPERS and Social Security benefits. Because spousal support is not

10

taxable to her, she will likely owe little to nothing in taxes (because her remaining, taxable, income is less than the standard deduction). After CalPERS deducts $140 for survivor benefits, Patricia will end up with $2,273 to cover her living expenses. John will continue to receive around $5,758 per month in gross monthly income, he will owe Patricia $1,600, and he will owe $665 for health insurance, leaving him with $3,493. John will also owe taxes on his income and will no longer be able to deduct spousal support.

The court also ruled that the modification to spousal support was retroactive to July 25, 2018, the date John filed his RFO.

ii.      *Spousal Support Arrears*

Calculating spousal support arrears began with a stipulation between the parties that we will call the "arrears stipulation." The arrears stipulation identified spousal support arrears for each year from 2015 through February 2021 (i.e., the month before trial) under three different scenarios labeled A, B and C. The parties stipulated that the amounts shown in each scenario were correct, but disagreed on which scenario applied.

Initially, the different scenarios reflected the fact that CSRS deducted from John's federal retirement benefit the cost of health insurance that covered both John and Patricia. The parties disagreed about how this deduction affected the amount of spousal support that John owed Patricia. In Scenario A, John's total income is divided by one-half, with no deduction for the cost of health insurance, and he owed that amount in spousal support. In Scenario B, the cost of health insurance is deducted from John's total income, and he owed one-half that amount in spousal support. Finally, in Scenario C, one-half the cost of health insurance is added back into John's total income, and he owed one-half that

amount in spousal support. John argued Scenario B should apply, and Patricia argued Scenario C should apply. The court adopted Scenario A.[6]

In 2018, things got more complicated, and each scenario now had three subparts (e.g., A1, A2 and A3) to reflect the fact that Patricia began receiving payments directly from CalPERS. The parties disagreed about how those payments affected the amount of spousal support that John owed Patricia. As noted above, the court ruled that Patricia was entitled to one-half of John's CalPERS benefit, and Scenario A1 reflected this ruling. Total spousal support arrears pursuant to Scenario A/A1, with interest, was $95,326.[7]

The amounts in the arrears stipulation were calculated pursuant to the MSA, and were thus based on spousal support equaling one-half of John's income. Because the trial court ruled that the modification to spousal support was retroactive to the date the RFO was filed, or to July 25, 2018, that meant the amounts shown on the arrears stipulation had to be further modified. For the first seven months of 2018 (i.e., January through July), arrears would be calculated pursuant to the MSA (i.e., John owed Patricia one-half his income), and for the last five months of 2018 and thereafter, arrears would be calculated based on the modified spousal support order (i.e., John owed Patricia $1,600 a month). Applying the modification retroactively, total arrears was reduced to $44,034.[8]

---

[6] Although the court did not explain its ruling, presumably it is because the MSA provides John "shall maintain [insurance] coverage" for Patricia, and does not provide he may deduct the cost of insurance when calculating spousal support.

[7] The arrears stipulation did not include interest. Both parties filed posttrial briefs that calculated interest. In her posttrial brief, Patricia calculated total arrears and interest utilizing Scenario C, which the court did not adopt. John calculated total arrears and interest utilizing Scenario A/A1, and the trial court adopted John's calculation. Patricia does not contest John's calculation, and we thus assume it is correct.

[8] The calculation is shown in John's posttrial brief, which was adopted by the trial court. Again, Patricia does not contest the calculation (she contests the retroactivity), so we will assume it is correct.

12

This amount was then further reduced by $12,646 to account for Visa and car insurance payments that John made on Patricia's behalf, plus interest thereon. With the Visa and car insurance payments deducted, the trial court awarded Patricia $31,388 in spousal support arrears.

### iii.    Attorney's Fees

Finally, the court addressed attorney's fees. John requested fees pursuant to section 271, which provides: "[T]he court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction." The court awarded John $2,000 in attorney's fees incurred opposing a motion to continue the trial date that Patricia had filed on the eve of trial. The court noted, "There was essentially no purpose for [the] motion to continue," and "there was a pointless expenditure of attorney's fees for [John]."

Patricia requested attorney's fees pursuant to the MSA, which provides the prevailing party in any action to enforce the MSA is entitled to recover reasonable attorney's fees. Regarding the amount of fees, Patricia's attorney stated, "The approximate number . . . is $34,000," Patricia added, "Plus two for today," and Patricia's attorney then stated, "$36,000." John's attorney argued any breach of the MSA on his part was unintentional because he believed he was meeting his support obligations at all times. Patricia's attorney responded that the fact the court ordered John to pay spousal support arrears established there was a breach of the MSA, and intent was not relevant.

The court awarded Patricia $6,000 in fees, explaining its reasoning as follows: "[T]he MSA is a disaster. It's horribly written. Extremely unclear. It's the MSA that caused all of this. [¶] [Patricia] is asking for . . . contractual attorney's fees. One of the factors that the Court has taken into account in determining what's called the Lo[d]e Star

13

Calculation is . . . the complexity of the issues. The complexity of the issues in this case was driven by the MSA [and] authorship [of the MSA] is attributed to [Patricia].[9] Because . . . if there [are] ambiguities, they get construed against the person who drafted the agreement or who had it drafted for him or her. Likewise, the complexity of this case here in the last three years nearly, since this RFO was filed, was driven almost entirely by this disaster of an MSA. [¶] [Patricia's] request for attorney's fees is granted in the amount of $6,000, less the $2,000 payable to [John], net order of $4,000 payable from [John] to [Patricia]."

Judgment was entered on September 23, 2021, and this appeal followed.[10]

## DISCUSSION

### I

### *Standard of Review*

"The modification of a spousal support order is reviewed on appeal for abuse of discretion. In exercising its discretion the trial court must follow established legal principles and base its findings on substantial evidence. If the trial court conforms to these requirements its order will be upheld whether or not the appellate court agrees with it or would make the same order if it were a trial court." (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 47, fn. omitted.) " 'Whether a modification of a spousal support order is warranted depends upon the facts and circumstances of each case, and its propriety rests in the sound discretion of the trial court the exercise of which this court will not disturb unless as a matter of law an abuse of discretion is shown.' [Citation.] An abuse of discretion occurs 'where, considering all the relevant circumstances, the court

---

[9] Patricia testified the MSA was drafted by "[m]y document assistant."

[10] Patricia filed a premature notice of appeal on August 20, 2021, after the final ruling was entered but before the judgment was entered. She also filed a notice of appeal on November 17, 2021, after the judgment was entered. We find her appeal was timely.

14

has exceeded the bounds of reason or it can fairly be said that no judge would reasonably make the same order under the same circumstances.' " (*In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 7.) A trial court also abuses its discretion if its findings are wholly unsupported by the evidence, " 'since a consideration of the evidence "is essential to a proper exercise of judicial discretion." ' " (*In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 836-837.)

Attorney's fee awards in marital dissolution cases are also reviewed for an abuse of discretion. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1166.)

## II

### *A Note on Patricia's Brief*

We note at the outset that both parties are proceeding in propria persona. A pro. per. litigant, however, is entitled "to no greater privilege or advantage than that given to one represented by counsel." (*Deauville v. Hall* (1961) 188 Cal.App.2d 535, 547.) "[I]in electing to represent himself 'he assumes for all purposes connected with his case, and must be prepared to be treated as having, the qualifications and responsibilities concomitant with the role he has undertaken; he is not entitled either to privileges and indulgences not accorded attorneys or to privileges and indulgences not accorded defendants who are represented by counsel.' " (*Ibid*.)

There are problems with Patricia's brief that we shall address. "It is the responsibility of the appellant . . . to support claims of error with meaningful argument and citation to authority. [Citations.] When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration. [Citations.] In addition, citing cases without any discussion of their application to the present case results in forfeiture. [Citations.] We are not required to examine undeveloped claims or to supply arguments for the litigants. [Citations.]" (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) Patricia does not support

15

her arguments with citation to, or discussion of, the legal authorities that are applicable to this case.

In the argument section of her opening brief, Patricia cites just two legal authorities—section 760, which defines community property as "all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state," and the United States Constitution's equal protection clause. Here is the entirety of her discussion of these authorities: "[The trial court] just ridiculed the MSA as a poorly written document and used that as an excuse to make a ruling totally contrary to the MSA, and California community property laws. Ca. Fam code section 760. The United States constitution 14th amendment section 1 states: 'nor shall any State deny any person within its jurisdiction, the equal protection under the law.' California community property laws state that each party owns 50% of the community property retirement income, regardless of which party worked at a job. This judgment was unfair, unjust, and not equal treatment under the laws of California which include contract law, and family law." That is all.

"A court need not consider an issue where reasoned, substantial argument and citation to supporting authorities are lacking. [Citations.] The mere assertion of a statutory or constitutional violation, followed by simply a citation to the statute or constitutional provision, does not merit a judicial response." (*Woods v. Horton* (2008) 167 Cal.App.4th 658, 677.) "[P]arties are required to include argument and citation to authority in their briefs, and the absence of these necessary elements allows this court to treat appellant's sanction issue as waived." (*Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448.) "[I]t is not this court's role to construct theories or arguments that would undermine the judgment and defeat the presumption of correctness. Rather, an appellant is required to present a cognizable legal argument in support of reversal of the judgment. 'When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is

16

unnecessary.' [Citation.] 'Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, [they are] waived.' [Citation.]" (*Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 600, disapproved on another ground in *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1012, fn. 2.)

Patricia's brief cites a few other legal authorities. In the "conclusion" section, she cites Civil Code sections 3300-3302 and 3353-3360—albeit with *no discussion* of how those statutory provisions are relevant to this case. Those sections deal with damages for breach of contract, but this is not a breach of contract case. Patricia's opening brief also includes a table of authorities, but she does not actually discuss those authorities in her brief, or explain how they are applicable.[11]

Finally, we note that Patricia's brief does not contain headings or subheadings summarizing each point, as required by rule 8.204 of the California Rules of Court. That " '[t]he briefs must present each point separately, under an appropriate heading, showing the nature of the question to be presented' was designed to lighten the labors of the appellate tribunals by requiring the litigants to present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass. An appellant's brief which fails to comply is equally confusing to the respondent, who labors under an unwarranted handicap in attempting to understandingly reply." (*Landa v. Steinberg* (1932) 126 Cal.App. 324,

---

[11] In addition to the code sections already mentioned, the table of authorities includes: section 2024 (which deals with notices required in a petition and judgment for legal separation); section 761 (which deals with community property that is transferred in trust); 26 Code of Federal Regulations part 1.4-3 (which deals with husband and wife filing separate federal tax returns); sections 720-721 (which deal with obligations spouses owe each other); and Penal Code section 368 (prescribing criminal penalties for elder abuse). Patricia's reply brief adds two new statutes to the table of authorities: Penal Code sections 503 (which defines embezzlement), and 487 (which defines grand theft).

325.) Indeed in this case, the respondent appropriately expresses uncertainty about how to respond to an opening brief that does not comply with this rule. "Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading." (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179.)

## III

### *Modification of Spousal Support*

We start with some blackletter law. First, section 3651 provides that "a [spousal] support order may be modified . . . at any time as the court determines to be necessary." (§ 3651, subd. (a).) As particularly relevant here, section 3651 also provides, "This section applies whether or not the support order is based upon an agreement between the parties." (§ 3651, subd. (e).) Finally, section 3651 provides a limited exception to the rule allowing modification of spousal support orders: "An order for spousal support may not be modified . . . to the extent that a written agreement . . . specifically provides that the spousal support is not subject to modification." (§ 3651, subd. (d).)

Here, the parties' MSA does *not* "specifically provide[] that the spousal support is not subject to modification." (§ 3651, subd. (d).) Instead, it expressly contemplates that spousal support *is* subject to modification, because it states John must pay Patricia one-half of his total income or at least $2,500 a month "commencing on March 31, 2014 and continuing . . . [¶] . . . [*u*]*ntil . . . modification . . . by further court order*." (Italics added.) That means that spousal support in this case is subject to modification "as the court determines to be necessary," (§ 3651, subd. (a)), even though the parties agreed when they executed the MSA that spousal support would be equal to one-half of John's total income or not less than $2,500 a month. That also disposes of the suggestion throughout Patricia's brief that the parties are forever bound by the spousal support provisions in their MSA. Section 3651 establishes that they are not, and that the court may modify spousal as it determines to be necessary.

18

Second, "Where the [marital settlement] agreement permits modifications, those modifications require a showing of a change in circumstances." (*In re Marriage of Aninger* (1990) 220 Cal.App.3d 230, 238; see also *In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1475 [" 'Modification of spousal support, even if the prior amount is established by agreement, requires a material change of circumstances since the last order' "].) "Change of circumstances means a reduction or increase in the supporting spouse's ability to pay and/or an increase or decrease in the supported spouse's needs. [Citations.] It includes all factors affecting need and the ability to pay." (*In re Marriage of McCann* (1996) 41 Cal.App.4th 978, 982.)

Third, the supporting spouse's retirement can constitute a change in circumstances that justifies the modification of spousal support. "[N]o one may be compelled to work after the usual retirement age of 65 in order to pay the same level of spousal support as when he was employed." (*In re Marriage of Reynolds* (1998) 63 Cal.App.4th 1373, 1378.) "[I]n the instance of a bona fide retirement, a supporting spouse should not be forced to continue working. Under those circumstances, the trial court may determine that there has been a material change in circumstances to justify a modification of support. [Citations.] Just as a married couple may expect a reduction in income due to retirement, a divorced spouse cannot expect to receive the same high level of support after the supporting spouse retires." (*Id.* at p. 1379; see also *In re Marriage of Sinks* (1988) 204 Cal.App.3d 586, 594 ["Certainly, we recognize the bona fide retirement of a supporting spouse warrants an examination by the trial court to determine if there has been a material change of circumstances to justify a modification in support"].)

Here, John retired at age 69, and there is no suggestion his retirement was anything other than bona fide. According to the parties' stipulation, in 2015, which is the year the judgment of separation was entered, John earned an average of around $3,517 a month from his job with the sheriff's department, and right before he retired in 2018, he filed an I&E stating he earned around $3,400 a month from his job. After he retired, he

19

received a CalPERS retirement benefit of $1,711 a month, which is about half of what he earned while he was working. This was a substantial decrease in income, and supports the trial court's finding that John's retirement and resulting decrease in income constituted a material change of circumstances.

The trial court's finding is also supported if we look at John's total income from all sources, not just from the sheriff's department/CalPERS. Using the numbers in the parties' stipulation, John's gross income decreased from around $8,019 a month in 2015 (the year the judgment of separation was entered), to around $5,600 a month in 2019 (the first full year after his retirement), and around $5,750 a month in 2020 (the year before the trial). This is a reduction of almost 30 percent. Again, this supports the trial court's finding that John's retirement, and the resulting decrease in his income, was a material change in circumstances.

Finally, we note that, after John retired, CalPERS began paying Patricia's share of his retirement benefit directly to her. Also around this time, Patricia began receiving her divorced spouse's Social Security benefit. This is another material change in circumstances, because it meant that Patricia now received over $800 a month directly from CalPERS and Social Security, and was thus no longer 100 percent dependent on spousal support to meet her living expenses.

Having properly found that a change in circumstances justified modifying spousal support, the trial court had to determine the amount. There is no formula that is used to determine the amount of spousal support. (See *In re Marriage of Olson, supra*, 14 Cal.App.4th at pp. 5-6, fn. 3.) Instead, section 4330, subdivision (a), provides the court may order spousal support in "an amount . . . that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances as provided in . . . Section 4320." Section 4320, in turn, requires the court to consider a long list of circumstances when setting or modifying spousal support. (See *In re Marriage of Swain, supra*, 21 Cal.App.5th at p. 836 [when

20

modifying spousal support "the trial court considers the same criteria set forth in section 4320 as it was obligated to consider in making the initial support order"].)  Those circumstances include:  (1) "The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage," (2) "The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties," (3) "The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party," (4) "The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living," (5) "The needs of each party based on the standard of living established during the marriage," (6) "The obligations and assets, including the separate property, of each party," (7) "The duration of the marriage," (8) "The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party," (9) "The age and health of the parties," (10) "The immediate and specific tax consequences to each party," (11) "The balance of the hardships to each party," (12) "The goal that the supported party shall be self-supporting within a reasonable period of time," and (13) "Any other factors the court determines are just and equitable."  (§ 4320.)

Although its findings were brief, it appears to us that the court made findings on all of these circumstances, and Patricia does not suggest otherwise.  Indeed, Patricia never mentions section 4320, much less specifically attacks any of the court's findings on the section 4320 circumstances.  She thus gives us no reason to hold that any of those findings are not supported by the evidence.

Instead, Patricia appears to argue that the trial court should have required John to continue to abide by the terms of the MSA, because, even in retirement, he makes over $5,000 a month and can thus afford to pay her one-half his income or not less than $2,500

21

a month.  Even if we assume John could afford to pay Patricia one-half his income, however, "ability . . . to pay spousal support" is only one of the circumstances enumerated in section 4320, and a trial court would abuse its discretion if it considered only that circumstance "to the exclusion of all others." (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 483; see *id.* at p. 486.)

We also reject Patricia's suggestion that John can easily afford to pay her one-half his income.  After the deduction for health insurance that covers Patricia,[12] John receives around $5,095 a month from all sources.  He also pays taxes, and although we do not know the precise amount, we do know that taxes will reduce the amount of income he has available to pay either spousal support or his own living expenses.  According to John's most recent I&E, his monthly expenses are around $3,200, and do not appear extravagant.  If he must pay Patricia one-half of his income in spousal support, he will not have enough left to pay his monthly expenses.  Moreover, if John must pay Patricia one-half his total income, while Patricia gets to keep all of her CalPERS and Social Security benefits, Patricia will end up with $3,688 a month to John's $2,875—which hardly seems "just and reasonable."  (§ 4330, subd. (a).)

Finally, Patricia appears to contend she is legally entitled to one-half of John's current total income, because that income is community property.  This is incorrect because not all of John's current income is community property.  "The earnings . . . of a spouse . . . *after the date of separation of the spouses*, are the separate property of the

---

[12] And we find no abuse of distribution in considering this deduction when determining the amount of spousal support.  We recognize that the MSA provides John shall maintain health insurance for Patricia and does not provide he may deduct the cost of this insurance from his total income for purposes of determining child support.  However, the trial court may modify this as it deems necessary based on John's diminished income in retirement.  Simply put, John has much less income in retirement, and the amount he pays for Patricia's insurance is money he does not have available to pay either spousal support or his own living expenses.

spouse." (§ 771, subd. (a), italics added; see also § 772 ["After entry of a judgment of legal separation of the parties, the earnings or accumulations of each party are the separate property of the party acquiring the earnings or accumulations"].) According to the petition for legal separation, the parties separated on March 31, 2014. That means John's earnings after that date, and retirement benefits accrued after that date, are his separate property. (See *In re Marriage of Wilson* (1974) 10 Cal.3d 851, 854 ["Retirement pay is part of the consideration earned by the employee. [Citations.] Only the consideration earned by an employee during marriage is community property"]; *Garfein v. Garfein* (1971) 16 Cal.App.3d 155, 158-159 [earnings after date of separation are separate property].) The most commonly used method of apportioning the community property portion of an employee spouse's retirement benefits is the "time rule," pursuant to which "the community interest in the retirement benefits is determined 'to be that fraction of retirement assets, *the numerator of which represents the length of service during the marriage but before the separation*, and the denominator of which represents the total length of service by the employee-spouse.' " (*In re Marriage of Bowen* (2001) 91 Cal.App.4th 1291, 1295, italics added.) That is the formula that was used in the QDRO to apportion John's CalPERS retirement benefits to Patricia, and, utilizing that formula, CalPERS calculated Patricia's community interest in John's retirement benefit is 37.79 percent. Patricia states the QDRO was "done wrong," but she does not explain what is wrong about it, and in any event, the QDRO is not at issue in this appeal.

Social Security and VA disability benefits are treated differently. "Although retirement benefits are generally community property under California law, federal law mandates that Social Security is separate property." (*In re Marriage of Peterson* (2016) 243 Cal.App.4th 923, 930.) That means John's Social Security benefit is his separate property, and Patricia's divorced spouse's Social Security benefit is her separate property. (Hogoboom & King, Cal. Prac. Guide: Family Law, *supra*, ¶ 8.256.)

23

Similarly, VA disability benefits are not divisible as community property in state court dissolution proceedings, although once they are paid, they may be considered by state courts when ordering spousal support. (*Mansell v. Mansell* (1989) 490 U.S. 581, 594-595; *Rose v. Rose* (1987) 481 U.S. 619, 635; *In re Marriage of Stanton* (2010) 190 Cal.App.4th 547, 551; *In re Marriage of Smith* (2007) 148 Cal.App.4th 1115, 1121.)

What the above discussion shows is that California community property laws do not entitle Patricia to one-half of John's current income. Although the MSA provides Patricia is entitled to one-half of John's total income or no less than $2,500 a month, the court modified that amount based on a material change in circumstances, which the law permits it to do. The question in this case is whether Patricia has demonstrated the trial court abused its discretion in setting spousal support at $1,600 a month. In deciding this question, we reiterate how deferential the standard of review is: "The test is not what order we would have made if one of us had been the trial judge. [¶] 'Our role as an appellate court is not that of factfinder; that is the role of the trial court.' [Citation.] The role of the appellate court is not to second-guess the trial judge. Reading a typed reporter's transcript does not enable us to view the witnesses, determine credibility or determine which conflicting evidence is to be given greater weight. [¶] 'We therefore heed "the well admonished rule of appellate review which finds a presumption that the [trial] court performed its duties in a regular and correct manner absent a clear showing to the contrary." [Citation.] "[T]he fact that a more liberal award might have been supported is not the proper test. [Citation.]" ' [Citation.]" (*In re Marriage of Smith, supra*, 225 Cal.App.3d at pp. 493-494.) Moreover, "It is a fundamental rule of appellate review that a judgment is presumed correct and the appealing party [here, Patricia] must affirmatively show error." (*In re Marriage of Khera & Sameer, supra*, 206 Cal.App.4th at p. 1484.) It thus does not matter that we might have set spousal support at more than $1,600 a month if we had been the trial judge. It also does not matter that the evidence would have supported an amount higher than $1,600. Instead, the sole question is

whether Patricia has affirmatively shown the trial court's order " 'has exceeded the bounds of reason or it can fairly be said that no judge would reasonably make the same order under the same circumstances.' " (*In re Marriage of Olson, supra*, 14 Cal.App.4th at p. 7.) She fails to make such a showing.

We note that, "In most instances, it is impossible at separation for either party to have sufficient funds to continue to live in the same life-style enjoyed during the marriage. After separation the parties have two households rather than one, and with California's high housing costs this represents a significant increase in living expenses." (*In re Marriage of Smith, supra*, 225 Cal.App.3d at pp. 488-489.) So, too, in this case. We also reiterate what we stated above, namely, that "[j]ust as a married couple may expect a reduction in income due to retirement, a divorced spouse cannot expect to receive the same high level of support after the supporting spouse retires." (*In re Marriage of Reynolds, supra*, 63 Cal.App.4th at p. 1379.) Here, particularly following John's retirement, neither party can afford to maintain the standard of living they enjoyed during their marriage. John now lives with his adult son, and Patricia lives in a rented apartment. John's current monthly expenses are around $3,215, and Patricia's are over $4,000. Between the two of them, their total gross income from all sources is around $6,600, and that is before taxes and various deductions. Mathematically, there is not enough money to allow both parties to pay their current living expenses, much less to maintain the same standard of living they enjoyed during their marriage. We find that Patricia has failed to meet her burden of affirmatively demonstrating the trial court's order setting spousal support at $1,600 a month " 'exceeded the bounds of reason or it can fairly be said that no judge would reasonably make the same order under the same circumstances.' " (*In re Marriage of Olson, supra*, 14 Cal.App.4th at p. 7.) She thus has not demonstrated an abuse of discretion that would justify reversal.

# IV

## *Spousal Support Arrears*

The court awarded Patricia $31,388 in spousal support arrears. Patricia challenges this award, but it is not clear on what basis. As noted above, the argument section of her brief has no headings, and she cites no legal authority, so it is difficult to parse out her arguments about arrears. If the trial court had not made modified spousal support retroactive to the date the RFO was filed, then arrears up through the time of trial would have been calculated as specified in the MSA and using the amounts shown on Schedule A/A1, and total arrears, with interest, would have been $95,326. This amount, however, was subject to two reductions—and it appears it is these two reductions that Patricia challenges.

The first, and biggest, reduction was caused by the court's ruling that modified spousal support of $1,600 a month was retroactive, because this ruling effectively meant that John was overpaying Patricia almost every month from August 2018 onward, that he thus owed no arrears for that time period, and that he was actually entitled to a credit on total arrears owed. Once this credit is factored in, arrears dropped to $44,034 (and as noted above, Patricia does not challenge the calculation, she challenges the retroactivity).

Patricia complains about the "injustice with a retroactive ruling which wiped out most of my arrears," and she asserts the retroactive ruling "stole my community property income, to which I was contractually entitled under the terms of the MSA, and California community property income laws." As discussed above, however, not all of John's current income is community property, and section 3651 expressly allows the court to modify the MSA as it determines to be necessary based on a change in circumstances. Moreover, the law expressly provides, "An order modifying . . . a support order may be made retroactive to the date of the filing of the" RFO. (§ 3653, subd. (a).) To the extent Patricia argues it was improper for the court to make the order retroactive, we disagree, because section 3653 expressly authorizes the court to make the order retroactive.

26

"No explicit statutory standards control the retroactivity decision. Rather, the matter lies within the trial court's sound discretion." (Hogoboom & King, Cal. Prac. Guide: Family Law, *supra*, ¶ 17.94b; see also *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 312.) In ordering that modified spousal support was retroactive, the trial court found "that the delays and long pendency of the instant [RFO] were largely, if not mostly, driven by [Patricia]," and Patricia does not challenge this finding. She thus fails to convince us that the trial court abused its discretion in making modified spousal support retroactive.

The second reduction to the amount of arrears was a $12,646 credit to John for Visa and car insurance payments that he made on Patricia's behalf. It is unclear whether Patricia challenges the reduction itself, the amount of the reduction, or both. In the argument section of her brief, she suggests the reduction for Visa payments is based on a "deliberate lie" that John told to the court (although we are not clear on what the alleged lie is). She never mentions the insurance payments. More important than her lack of any cogent argument on this issue, however, is the fact that Patricia's attorney acknowledged at trial that (1) John was entitled to deduct from spousal support arrears amounts he paid on Patricia's behalf for Visa and car insurance, (2) exhibit Nos. 14 and 15 accurately showed those amounts, and (3) those amounts should "be credited back" to John. The amounts shown on exhibit Nos. 14 and 15 total $12,646. Patricia's attorney also filed a pretrial statement of issues that included these two exhibits as attachments, and that acknowledged the amounts shown thereon "should be deducted from the support arrears." Having acknowledged in the trial court that John was entitled to a credit of $12,646, Patricia cannot now argue on appeal that he is not entitled to that credit. "It is axiomatic that arguments not asserted [in the trial court] are waived and will not be considered for the first time on appeal." (*Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3.) Similarly, " 'As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory

(or theories) on which their cases were tried.  This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal.' " (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1344.)  The trial court thus did not err in reducing arrears by $12,646.

Patricia thus fails to convince us that the court erred in awarding her $31,388 in arrears.

**V**

***Attorney's Fees and Costs***

The court awarded Patricia $6,000 and John $2,000 in attorney's fees, leaving a net total of $4,000 owing from John to Patricia.  Patricia does not argue the trial court erred in awarding $2,000 to John, so we will assume she does not challenge his fee award.  Instead, she only challenges her fee award.

Patricia's argument, both here and in the trial court, is that she is entitled to attorney's fees pursuant to section 15 of the MSA, which states, "The prevailing party in any action or proceeding to enforce the terms, covenants or conditions of this Agreement . . . shall be entitled to recover and be awarded her (his) (its) reasonable attorney fees and costs incurred in connection with such proceedings or efforts."  Patricia contends her RFO seeking spousal support arrears was an action to enforce the terms of the MSA, and she prevailed on her RFO as evidenced by the fact the court awarded her significant arrears.  The trial court clearly agreed, because it awarded her $6,000 in attorney's fees. It thus appears that the only issue is the amount of the award.

Patricia contends she is entitled to $36,000 in attorney's fees, and the court erred in awarding her only $6,000.  We note at the outset that we have no idea where this amount come from, other than the following snippet of testimony from the trial:

PATRICIA'S ATTORNEY:  "[S]he is seeking . . . her attorney's fees under the MSA.

28

"THE COURT: In the amount of?

"[ATTORNEY]: In the amount of -- I believe we --

"[PATRICIA]: It was -- to begin with, it was 38 something, and then John has paid almost $3,636 from an award I had from Judge Curry on March 11th of 2020 for the last year, and then I've had to retain [my attorney] a few times since then, and since today, yesterday I have to as well pay more to that.

"[ATTORNEY]: The approximate number, Your Honor, is $34,000.

"[PATRICIA]: Plus two for today.

"[ATTORNEY]: $36,000."

That is all. Patricia does not point us to any documentation substantiating her request for $36,000 in attorney's fees. "[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. 'California courts have consistently held that a computation of time spent on a case and the reasonable value of that time is fundamental to a determination of an appropriate attorneys' fee award.' " (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) Fee requests are also generally supported by evidence substantiating the amount sought (i.e., billing or time records, a declaration from counsel estimating hours spent, etc.). (See *id*. at p. 1096, fn. 4 ["maintaining contemporaneous records by . . . counsel of hours spent on a case . . . would facilitate accurate calculation of the lodestar and minimize possible inaccuracies in reconstructing time spent on a matter months or even years after the fact"]; *Taylor v. County of Los Angeles* (2020) 50 Cal.App.5th 205, 207, 213-214 [noting it may be possible to award fees based on lawyer's testimony about hours devoted to case, but "contemporaneous time records are the best evidence of lawyers' hourly work. They are not indispensable, but they eclipse other proofs"]; *Weber v. Langholz* (1995) 39 Cal.App.4th 1578, 1586-1587 [declaration

from counsel stating hourly rate and total fees incurred, and describing work done, sufficient to support fee award].)  Here, Patricia points to no evidence showing the number of hours her attorney spent litigating her RFO (as opposed to opposing John's RFO), and no evidence about her attorney's hourly rate.  The trial court may well have concluded that a substantial amount of the time spent on this case was spent opposing John's request to modify spousal support, and not Patricia's request for spousal support arrears.  (See *Modglin v. Modglin* (1966) 246 Cal.App.2d 411, 416.)

Moreover, and assuming Patricia contends she is automatically entitled to *all* of the attorney's fees she incurred litigating her RFO, we note that the MSA's plain language limits her to recovering "*reasonable*" attorney's fees.  (Italics added.) "Whether an award of attorney fees is based on statutory or contractual provisions, ' "[t]he trial court has broad discretion to determine the amount of a reasonable fee, and the award of such fees is governed by equitable principles." '  [Citations.]  'This determination is necessarily ad hoc and must be resolved on the particular circumstances of each case.'  [Citation.]  [¶]  ' "The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong' "—meaning that it abused its discretion.'  [Citations.]  The appellant challenging the award 'bear[s] the burden of affirmatively establishing that the trial court abused its discretion.'  [Citation.]  As with most trial court orders, we ' "presume the trial court's attorney fees award is correct." '  [Citation.]"  (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 954.)  We thus start with the presumption that the trial court's fee award is correct, and Patricia has the burden of affirmatively establishing the award is clearly wrong.  With almost no argument from Patricia on this issue, and with no evidence documenting the amount of fees sought, she fails to meet her burden.

# VI

## *Miscellaneous Arguments*

Patricia mentions two other things in her brief that we briefly address—what happened to the house John purchased with Brandon, and a life insurance policy.

As noted above, after the parties separated, John and Brandon purchased a house together, and John later quitclaimed his interest in the house to Brandon after Patricia threatened to put a lien on it. Patricia contends this transfer was "fraudulent." On June 30, 2020, almost nine months before the trial, Patricia filed an RFO asking the court to order John to disclose information about the transfer, arguing it could materially reduce John's equity in the house, which would, in turn, frustrate her ability to foreclose on the home in order to enforce his spousal support obligations. The court ordered John to produce documentation regarding the transfer and refinance.

In her brief on appeal, Patricia states John never provided this documentation. She also complains the trial court "refused to hear testimony from son Brandon Cherinka regarding the quit claim of [John's] half ownership of their home to Brandon, and the refinance of the loan. [¶] Brandon and [John] were subpoenaed to testify about this fraudulent transfer of [John's] equity asset in the house to avoid a lien being placed on the house. This lien would secure payment of arrears and attorney's fees, which he knew he owed me . . . . Judge . . . in his Feb 26, 2021, pretrial ruling, that was actually my RFO to the court, denied Brandon's testimony, and he denied me getting the court ordered quit claim and refinance information. [John's] home equity was critical information to prove he could pay his debt to me." Patricia does not support these statements with any citation to the record. Presumably, however, she is referring to the trial court's February 26, 2021 pretrial order, in which it ruled that discovery compliance issues (i.e., John's alleged failure to provide documentation about the transfer) must be adjudicated as provided in the Civil Discovery Act (Code Civ. Proc., § 2016.010 et seq.), and would not be adjudicated at trial. To the extent Patricia challenges this ruling, she

31

fails to convince us it was erroneous because we agree that trial is not the appropriate venue to adjudicate discovery disputes.

The trial court also ruled that it "decline[d] to join the issue of the transaction between [John] and the parties' son Brandon to the trial issues. Brandon has not been joined as a party to the action, and the court therefore lacks jurisdiction to adjudicate his right, title, and interest in the property." Again, assuming Patricia challenges this ruling, we find no abuse of discretion. (See *People v. Young* (2019) 7 Cal.5th 905, 931 [trial court's decision to exclude evidence reviewed for abuse of discretion, and will be upheld unless it acted in arbitrary, capricious, or absurd manner resulting in a miscarriage of justice].) Patricia complains in her brief that John was "hiding his equity in the house," and she appears to fault the trial court for "fail[ing] to order [John's] name back on the deed/loan before and at trial." We are aware of no legal authority (and Patricia cites none) that would allow the trial court to order John's name back on the deed or that would require the trial court to adjudicate John's interest in the house as part of a trial on spousal support. Finally, to the extent Patricia complains the trial court would not allow Brandon to testify, she fails to explain what testimony he would have provided that was relevant to any of the issues at trial (i.e., modifying spousal support, spousal support arrears, and attorney's fees). We also note Patricia's attorney never tried to call Brandon to testify during the trial.

Patricia also appears to have some type of complaint about John cashing out a life insurance policy, but we are unable to ascertain precisely what her complaint is. It may have to do with the fact that, in 2020, John received a form 1099 from the Protective Life Insurance Co. showing a "[g]ross distribution" of $22,997.97, and a "[t]axable amount" of $12,417.17. John's accountant testified that she included the $12,417 taxable amount in John's total income on his 2020 tax return. John's attorney then stated, "[John] didn't receive any funds from the life insurance policy, they were all solely for the benefit of wife," and Patricia's attorney responded, "I do not dispute that statement." With no

cogent argument from Patricia on this issue, we are unable to ascertain what complaint, if any, she has about the distribution on the life insurance policy.

## DISPOSITION

The judgment is affirmed. Each side to bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)


_____/s/_____
EARL, J.



We concur:



_____/s/_____
RENNER, Acting P. J.



_____/s/_____
KRAUSE, J.